## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DAVID SCHOTTENSTEIN, Individually
And On Behalf Of All Others Similarly
Situated,

              Plaintiff,

   v.

CREDIT SUISSE AG, CREDIT SUISSE
SECURITIES (USA) LLC, BRADY W.
DOUGAN, RENATO FASSBIND, D. NEIL
RADEY, PAUL J. O'KEEFE, WALTER B.
KIELHOLZ, HANS-ULRICH DOERIG,
PETER BRABECK-LETMATHE, THOMAS
W. BECHTLER, ROBERT H.
BENMOSCHE, NOREEN DOYLE, JEAN
LANIER, ANTON VAN ROSSUM, AZIZ R.
D. SYRIANI, DAVID W. SYZ, ERNST
TANNER, RICHARD E. THORNBURGH,
and PETER F. WEIBEL,

              Defendants.



JUDGE SWAIN

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

12 CV 4191

RECEIVED
MAY 25 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following, based on counsel's investigation, documents filed with the Securities and Exchange Commission ("SEC"), press releases, news stories and other information obtained by Plaintiff.

### INTRODUCTION

1.    Plaintiff and the other members of the class ("Class") purchased VelocityShares Daily 2x VIX Short Term Exchange Traded Notes linked to the S&P 500 VIX Short-Term Futures Index ("TVIX ETNs") pursuant and/or traceable to a November 29, 2010 pricing supplement (the "Pricing Supplement" and, together with a March 25, 2009 Registration

Statement and Prospectus, the ("Offering Documents")) and held TVIX ETNs through and including March 22, 2012, thereby suffering economic damages (the "Class Period").[1]

2.      TVIX ETNs were sold to members of the Class during the Class Period by Credit Suisse AG and its affiliate Credit Suisse Securities (USA) LLC (together, "Credit Suisse" or the "Company").

*Exchange Traded Notes*

3.      Exchange Traded Notes ("ETNs"), while often discussed in tandem with Exchange Traded Funds ("ETFs"), are markedly different instruments. ETFs entitle an investor to own a basket of underlying securities. In the event of bankruptcy, ETF shareholders are entitled to receive the cash equivalent of the underlying basket of securities. Thus, ETFs are akin to mutual funds in that they are registered investment companies.

4.      ETNs, in contrast, are SEC registered securities that are essentially debt instruments issued by a large financial institution, such as Credit Suisse, and are one of the most popular innovations in recent years to allow investors exposure and hedging capability to market fluctuations. TVIX ETNs are an example, and purportedly offer leveraged exposure to the VIX

---

[1] During the Class Period, the November 29, 2010 Pricing Supplement was amended, restated and superseded by Pricing Supplement No. VLS ETN-1/A dated December 8, 2010, Pricing Supplement No. VLS ETN-1/A2 dated March 30, 2011, Pricing Supplement No. VLS ETN-1/A3 dated April 8, 2011, Pricing Supplement No. VLS ETN-1/A4 dated May 31, 2011, Pricing Supplement No. VLS ETN-1/A5 dated June 27, 2011, Pricing Supplement No. VLS ETN-1/A6 dated July 1, 2011, Pricing Supplement No. VLS ETN-1/A7 dated August 10, 2011, Pricing Supplement No. VLS ETN-1/A8 dated January 19, 2012, Pricing Supplement No. VLS ETN-1/A9 dated January 27, 2012, Pricing Supplement No. VLS ETN-1/A10 dated February 2, 2012, Pricing Supplement No. VLS ETN-1/A11 dated February 3, 2012 and Pricing Supplement No. VLS ETN-1/A12 dated February 16, 2012. Each of the Pricing Supplements refers back to and incorporates by reference the March 25, 2009 Registration and Prospectus and is materially the same with respect to content.

short-term futures index, an index comprised of front month futures, with a 200% leverage on the movements in the index.[2]

5.      Unlike an ETF investor, an ETN investor does not own a basket of securities, but instead, a "promise" that the ETN will track a designated index and that the issuer will pay the note according to the terms contained in the underlying offering documents.  Accordingly, an ETN is similar to an uncollateralized loan extended to the issuing investment bank by the investor, with all of the risks afforded to a debtor/creditor relationship.

6.      Investors who hold their ETN to maturity receive a cash payment calculated from the beginning trade date to the ending period, or maturity date. The annual fees deducted reduce the value of the payment. Maturity periods can vary and may be as long as 30 years. ETN investors who do not want to hold their note to maturity may sell it prior to maturity on the exchange where they trade.

7.      TVIX ETNs commenced trading on November 30, 2010 and were originally issued at $100 per share.

8.      On February 21, 2012, Credit Suisse announced that it temporarily suspended further issuances of the TVIX ETNs due to "internal limits" reached on the size of the ETNs. As a result of the suspension, shares of TVIX subsequently traded at prices uncorrelated to the S&P VIX Short-term Futures index – the index that the ETN was supposed to track through the use of VIX futures. This "disconnect" lasted for approximately one month.

---

[2] The "VIX" is a ticker symbol for the Chicago Board Options Exchange Market Volatility Index, a popular measure of the implied volatility of S&P 500 index options. Often referred to as the *fear index* or the *fear gauge*, it represents one measure of the market's expectation of stock market volatility over the next 30 day period.

9.     On March 22, 2012, shares of TVIX declined in price by over 29% as rumors leaked into the market that Credit Suisse was considering whether to recommence issuance of the ETNs.  That evening, Credit Suisse announced that it would in part reopen issuance of TVIX shares on a limited basis and on March 23, 2012, shares of TVIX declined further by almost 30% resulting in devastating losses for investors.

10.     As detailed herein, the Offering Documents materially understated certain risks associated with these investments. Defendants also misleadingly omitted to disclose necessary information and material risks of certain scenarios transpiring that might lead to large losses from investments in TVIX ETNs.

## PARTIES

11.     Plaintiff David Schottenstein purchased TVIX ETNs during the Class Period. Defendants' material misrepresentations and omissions were the cause of actual losses suffered by Plaintiff.

12.     Defendant Credit Suisse AG ("Credit Suisse AG") is the issuer of the TVIX ETNs and is a subsidiary of the Credit Suisse Group AG, a Swiss corporation.

13.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse USA"), an affiliate of Credit Suisse AG, is the agent for the TVIX ETN offering and is a subsidiary of Credit Suisse (USA), Inc., a Delaware corporation.

14.     Defendant Brady W. Dougan ("Dougan") is the Chief Executive Officer of Credit Suisse Group AG. Defendant Dougan signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse AG and the TVIX ETNs.

4

15.     Defendant Renato Fassbind ("Fassbind") who the Chief Financial Officer of Credit Suisse Group AG. Defendant Fassbind signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse AG and the TVIX ETNs.

16.     Defendant D. Neil Radey ("Radey") is the General Counsel of Credit Suisse (USA), Inc. Defendant Radey signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse (USA), Inc. and the TVIX ETNs.

17.     Defendant Paul J. O'Keefe ("O'Keefe") is the Chief Financial and Accounting Officer of Credit Suisse (USA), Inc. Defendant O'Keefe signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse (USA), Inc. and the TVIX ETNs.

18.     Defendant Walter B. Kielhoz ("Kielhoz") was Chairman of the Board of Directors of Credit Suisse Group AG. Defendant Kielhoz signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse (USA), Inc. and the TVIX ETNs.

19.     Defendant Hans-Ulrich Doerig ("Doerig") was Vice Chairman of the Board of Directors of Credit Suisse Group AG. Defendant Kielhoz signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

20.     Defendant Peter Brabeck-Letmathe ("Brabeck-Letmathe") is Vice Chairman of the Board of Directors of Credit Suisse Group AG. Defendant Brabeck-Letmathe signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

21.     Defendant Thomas W. Bechtler ("Bechtler") was on the Board of Directors of Credit Suisse Group AG. Defendant Bechtler signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

22.     Defendant Robert H. Benmosche ("Benmosche") sits on the Board of Directors of Credit Suisse Group AG. Defendant Benmosche signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

23.     Defendant Noreen Doyle ("Doyle") sits on the Board of Directors of Credit Suisse Group AG. Defendant Doyle signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

24.     Defendant Jean Lanier ("Lanier") sits on the Board of Directors of Credit Suisse Group AG. Defendant Lanier signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

25.     Defendant Anton van Rossum ("Rossum") sits on the Board of Directors of Credit Suisse Group AG. Defendant Rossum signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

26.     Defendant Aziz R. D. Syriani ("Syriani") sits on the Board of Directors of Credit Suisse Group AG. Defendant Syriani signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

27.     Defendant David W. Syz ("Syz") sits on the Board of Directors of Credit Suisse Group AG. Defendant Syz signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

6

28.     Defendant Ernst Tanner ("Tanner") was on the Board of Directors of Credit Suisse Group AG. Defendant Tanner signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

29.     Defendant Richard E. Thornburgh ("Thornburgh") sits on the Board of Directors of Credit Suisse Group AG. Defendant Thornburgh signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

30.     Defendant Peter F. Weibel ("Weibel") sits on the Board of Directors of Credit Suisse Group AG. Defendant Weibel signed the Registration Statement concerning the TVIX ETNs and exercised control over the affairs of Credit Suisse Group AG and the TVIX ETNs.

31.     Defendants described in paragraphs 14 - 30 are collectively referred to as the "Individual Defendants."

## JURISDICTION AND VENUE

32.     The claims asserted herein arise under and pursuant to Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

33.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act.

34.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District, and the TVIX ETNs trade in this District on the New York Stock Exchange Arca ("NYSE Arca").

35.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3) on behalf of a Class consisting of all persons or entities who acquired shares of the TVIX ETNs  pursuant or traceable to the false and misleading Offering Documents, and were damaged thereby. Excluded from the Class are Defendants, the officers, directors and trustees of Credit Suisse and/or VelocityShares LLC, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

38.     Plaintiff's claims are typical of the claims of each of the members of the Class as all members of the Class are similarly affected by Defendants' identical wrongful conduct in violation of federal law that is complained of herein and in connection with the issuance of the TVIX ETNs.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    what are the true methods and inherent risks involved in Defendants' operation of their TVIX ETNs;

(b)    whether Defendants adequately disclosed the risks of loss of an investment made in TVIX ETNs;

(c)    whether the Offering Documents contained misleading statements because of Defendants' failure to disclose material facts concerning TVIX ETNs;

(d)    whether Defendants failed to disclose material risks concerning TVIX ETNs;

(e)    whether the Securities Act was violated by Defendants' failures to disclose the risks and the related facts as alleged herein concerning TVIX ETNs;

(f)    whether control person liability for such violations is appropriate; and

(g)    to what extent the members of the Class have sustained damages and the proper measure of damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## TVIX ETNS WERE OFFERED PURSUANT TO
## FALSE AND MISLEADING OFFERING DOCUMENTS

42.    The Offering Documents included numerous materially false and misleading statements and omitted material information concerning the risks associated with investing in TVIX ETNs.

9

43.     With respect to Credit Suisse hedging the exposure it would incur from issuing the ETNs, the Pricing Supplement stated the following:

> We expect to hedge our obligations under the ETNs through one or more of our affiliates.  This hedging activity will likely involve purchases or sales of equity securities underlying the S&P 500® Index and/or trading in instruments, such as options, swaps or futures, related to the VIX Index (including the VIX futures contracts which are used to calculate the Indices), the S&P 500® Index (including the put and call options used to calculate the level of the VIX Index) and the equity securities underlying the S&P 500® Index.  The costs of maintaining or adjusting this hedging activity could affect the value of the Index, and accordingly the value of the ETNs.  Moreover, this hedging activity may result in our or our affiliates' receipt of a profit, even if the market value of the ETNs declines. You should refer to "Risk Factors—Trading and other transactions by us, our affiliates or third parties with whom we transact, in securities or financial instruments related to the applicable underlying Index may impair the market value of the ETNs" and "Risk Factors—There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents" and "Use of Proceeds and Hedging" in this pricing supplement.

44.     With respect to general "risk factors" related to the ETNs, the Pricing Supplement offered only broadly worded and overly general risks that might materialize under limited circumstances. For example, with respect to what effect Credit Suisse's actions or credit worthiness might have on the TVIX ETNs, the Pricing Supplement stated the following:

> The ETNs are subject to the credit risk of Credit Suisse
>
> Although the return on the ETNs of each series will be based on the performance of the applicable underlying Index, the payment of any amount due on the ETNs, including any payment at maturity, is subject to the credit risk of Credit Suisse.  Investors are dependent on Credit Suisse's ability to pay all amounts due on the ETNs, and therefore investors are subject to our credit risk.   In addition, any decline in our credit ratings, any adverse changes in the market's view of our creditworthiness or any increase in our credit spreads is likely to adversely affect the market value of the ETNs prior to maturity.

45.     With respect to what factors might influence the market price of the ETNs, the

Company offered the following broad warnings:

> The market price of your ETNs may be influenced by many unpredictable factors
>
> The market value of your ETNs will fluctuate between the date you purchase them and the applicable Valuation Date.  You may also sustain a significant loss if you sell the ETNs in the secondary market.  In addition to others, the following factors, many of which are beyond our control, will influence the market value of your ETNs, as well as the applicable Redemption Amount: the level of the applicable underlying Index at any time, the volatility of any option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, the liquidity of any option or futures contracts relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the or the underlying futures, economic, financial, regulatory, political, judicial, military and other events that affect stock markets generally, the applicable underlying Index, the equity securities included in the S&P 500® Index, the S&P 500® Index, the VIX Index or the relevant futures contracts on the VIX Index, supply and demand for the ETNs in the secondary market, including but not limited to, inventory positions with any market maker or other person or entity who is trading the ETNs (supply and demand for the ETNs will be affected by the total issuance of ETNs, and we are under no obligations to issue additional ETNs to increase the supply), interest and yield rates and rate spreads in the markets, the time remaining until your ETNs mature, and the actual or perceived creditworthiness of Credit Suisse.

46.     The Pricing Supplement further related information concerning how Credit Suisse

would hedge its potential exposure to the risk associated with issuing the ETNs:

> Trading and other transactions by us, our affiliates, or third parties with whom we transact, in securities or financial instruments related to the applicable underlying Index may impair the value of your ETNs
>
> We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative

instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index. Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index,  or the underlying futures, or instruments whose returns are linked to the applicable underlying Index or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500®

Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or derivative instruments with returns linked to changes in the level of the applicable underlying Index or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

47.    The Pricing Supplement disclosed certain information concerning what would constitute a "market disruption":

Market Disruption Events

A "Market Disruption Event" will be any event that, in the determination of the Calculation Agents, could materially interfere with our, our affiliates, third parties with whom we transact, or similarly situated third party's ability to establish, maintain or unwind all or a material portion of a hedge that could be effected with respect to the ETNs, including, but not limited to: a suspension, absence or material limitation of trading in option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, if available, not trading on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents, the Index Sponsor or the CBOE fails to publish or compute the Indices or VIX Index, or any trading restriction imposed upon, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange due to a price change in that respective instrument exceeding limits set by that market before the close of

13

trading in that market on any day, as determined by the Calculation Agents.

*Misstatements and Omissions in the Offering Documents*

48.     Though seemingly lengthy and technical, these risk disclosures were opaque and omitted material information.

49.     For instance, Credit Suisse omitted material information concerning what was likely to occur if, in the face of heavy demand for TVIX ETNs, it surpassed certain internal issuance limits triggering a decision to no longer issue ETNs because it was unable to hedge its underlying exposure.

50.     Credit Suisse omitted from the Pricing Supplement material information concerning the probability that TVIX could dislocate from the relevant VIX benchmark or, more specifically, its indicative value, when and if Credit Suisse decided to no longer issue the ETNs.

51.     Credit Suisse omitted from the Pricing Supplement material information that there was an internal limit on the number of ETNs it would issue that was based on its ability to enter into offsetting hedging transactions.

52.     Credit Suisse omitted from the Pricing Supplement material information concerning risks associated with the structure of the platform of TVIX, namely that TVIX was a "vertical model" not an open platform.  Given the vertical model, Credit Suisse was the issuer, market-maker, and swap provider on its ETNs.  The Pricing Supplement omitted that this model limited Credit Suisse's ability to hedge its exposure to the TVIX thus rendering it highly probable that Credit Suisse would inevitably run up against internal risk exposure limits necessitating it to "turn of the spigot," which would likely lead to dislocation, speculation, and damage to investors.

14

53.     Credit Suisse omitted material information from the Pricing Supplement concerning how difficult it is to hedge a vertical product relative to a horizontal product and that once certain internal limits were met, the bank would be forced to stop issuing the ETNs.

54.     Credit Suisse omitted material information from the Pricing Supplement concerning the degree to which Credit Suisse used the issuance of TVIX ETNs and other ETNs to fund its own vast portfolios of securities and trading positions, nor did Credit Suisse disclose that the TVIX (and other) ETNs are used to offset the risks it incurs from its daily business.

55.     The Pricing Supplement failed to disclose the risk that TVIX could potentially appear on the "threshold list" (a list of securities that are no longer available to be borrowed in order to short) and that it would be more likely to appear on the list should Credit Suisse suspend issuing shares.

56.     The Pricing Supplement failed to disclose the risk that arbitrageurs would be rendered virtually useless in eliminating premiums in the market value for TVIX if they could not "locate" shares to sell short, and the risk that once it was found out - through a public announcement or *otherwise* - that Credit Suisse would resume issuances, the premium could collapse immediately.

**The Consequences: Credit Suisse announces that it will no longer issue TVIX ETNs**

57.     On February 21, 2012, Credit Suisse announced that it had temporarily suspended further issuances of the TVIX ETNs due to "internal limits" on the size of the ETNs:

> Credit Suisse Temporarily Suspends Further Issuance of VelocityShares Daily 2x Long VIX Short-Term ETN (Ticker Symbol: "TVIX")
>
> New York, February 21, 2012 Credit Suisse announced today that it has temporarily suspended further issuances of the VelocityShares Daily 2x VIX Short-Term ETNs (Ticker Symbol: "TVIX") due to internal limits on the size of the ETNs. This

15

suspension does not affect the Early Redemption rights of noteholders as described in the pricing supplement. The other ETNs issued by Credit Suisse are not affected by this suspension.

As disclosed in the pricing supplement relating to the ETNs under the heading "Risk Factors—The Market Price of Your ETNs May Be Influenced By Many Unpredictable Factors," the market value of the ETNs may be influenced by, among other things, the levels of supply and demand for the ETNs. It is possible that the suspension, as described above, may influence the market value of the ETNs. Credit Suisse believes it is possible that the temporary suspension of further issuances may cause an imbalance of supply and demand in the secondary market for the ETNs, which may cause the ETNs to trade at a premium or discount in relation to their indicative value. Therefore, any purchase of the ETNs in the secondary market may be at a purchase price significantly different from their indicative value.

The pricing supplement relating to the ETNs can be found on EDGAR, the SEC website at: www.sec.gov.

58.     As a result of the suspension, shares of TVIX ETNs traded at prices uncorrelated to the S&P VIX Short-term Futures index – the index that the ETN was designed to track through the use of VIX futures. This "disconnect" lasted for approximately one month, and became progressively worse, as demonstrated below, taken from *Bloomberg*, comparing the daily market price of TVIX to its indicative value:

```
<HELP> for explanation.                                          EquityNAV
```

| | Date | Price | NAV | % Premium | | Date | Price | NAV | % Premium |
|---|---|---|---|---|---|---|---|---|---|
| F | | | | | F | 03/09/2012 | 14.89 | 12.5906 | 18.263% |
| T | | | | | T | 03/08/2012 | 15.12 | 13.2518 | 14.098% |
| W | 03/28/2012 | 7.198 | 6.8889 | 4.486% | W | 03/07/2012 | 16.18 | 14.2482 | 13.558% |
| T | 03/27/2012 | 6.9699 | 6.8316 | 2.024% | T | 03/06/2012 | 17.0801 | 16.3618 | 4.390% |
| M | 03/26/2012 | 5.8799 | 5.5641 | 5.676% | M | 03/05/2012 | 16.36 | 13.8808 | 17.861% |
| | | | | | | | | | |
| F | 03/23/2012 | 7.16 | 6.6963 | 6.926% | F | 03/02/2012 | 16.22 | 14.074 | 15.248% |
| T | 03/22/2012 | 10.20 | 7.8323 | 30.230% | T | 03/01/2012 | 16.29 | 13.6036 | 19.749% |
| W | 03/21/2012 | 14.43 | 7.6175 | 89.432% | W | 02/29/2012 | 16.72 | 14.7236 | 13.559% |
| T | 03/20/2012 | 15.13 | 8.5088 | 77.816% | T | 02/28/2012 | 16.60 | 14.6247 | 13.507% |
| M | 03/19/2012 | 15.07 | 9.3163 | 61.759% | M | 02/27/2012 | 16.69 | 15.4957 | 7.707% |
| | | | | | | | | | |
| F | 03/16/2012 | 14.81 | 10.8779 | 36.147% | F | 02/24/2012 | 16.66 | 15.0605 | 10.620% |
| T | 03/15/2012 | 14.19 | 11.1349 | 27.437% | T | 02/23/2012 | 16.00 | 13.8129 | 15.833% |
| W | 03/14/2012 | 14.066 | 11.5869 | 21.396% | W | 02/22/2012 | 16.90 | 15.9149 | 6.190% |
| T | 03/13/2012 | 13.715 | 10.5064 | 30.540% | T | 02/21/2012 | 17.01 | 16.9873 | 0.124% |
| M | 03/12/2012 | 14.03 | 11.3255 | 23.880% | M | 02/20/2012 | N/A | N/A | N/A |

```
Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900      Singapore 65 6212 1000      U.S. 1 212 318 2000     Copyright 2012 Bloomberg Finance L.P.
                                                      SN 273587 G597-788-1 02-Apr-12 17:38:27 EDT GMT-4:00
```

59.     Credit Suisse's decision to cease issuing the ETNs fueled an aggressive and precarious increase in the number of shares shorted by investors. The following table illustrates the dramatic increase in short interest for TVIX after the February 21, 2012 Press Release:

TVIX US $ ↓ **8.58** -.83 D 1s T 8.58/8.59 T 14x14 **EquitySI**
DELAY 12:42 Vol 7,611,451 Op 9.335 K Hi 9.38 P Lo 8.57 B ValTrd 67656960

| TVIX US Equity | 1) Chart View | | | Short Interest |
|---|---|---|---|---|
| 11) Exchange Reported | 12) Data Explorers | | | |
| Date 03-Jan-2011 - 23-Apr-2012 | | 2) Sector Analysis (SIA) | 3) DX SI Score (DXPL) | N.A. |
| Short Interest | 7,191,139 | SI Ratio | .44 | |
| Change in Short Interest | 328,660 | Change in SI Ratio | -0.23 | |

0) Output to Excel

| Date | Short Interest | Close | Avg Daily Vol | Short Int Ratio |
|---|---|---|---|---|
| 03/30/2012 | 7,191,139 | 7.23 | 16.42 M | 0.44 |
| 03/15/2012 | 6,862,479 | 14.19 | 10.35 M | 0.66 |
| 02/29/2012 | 3,985,507 | 16.72 | 21.26 M | 0.19 |
| 02/15/2012 | 1,860,907 | 19.08 | 19.42 M | 0.10 |
| 01/31/2012 | 2,070,103 | 17.96 | 8.95 M | 0.23 |
| 01/13/2012 | 2,126,328 | 24.83 | 3.93 M | 0.54 |
| 12/30/2011 | 1,486,944 | 31.95 | 2.42 M | 0.62 |
| 12/15/2011 | 1,103,084 | 39.36 | 3.42 M | 0.32 |
| 11/30/2011 | 1,128,096 | 45.53 | 3.88 M | 0.29 |
| 11/15/2011 | 1,124,316 | 51.98 | 4.59 M | 0.24 |
| 10/31/2011 | 1,199,402 | 45.40 | 4.14 M | 0.29 |
| 10/14/2011 | 1,366,637 | 49.89 | 2.35 M | 0.58 |
| 09/30/2011 | 1,298,928 | 39.43 | 2.61 M | 0.50 |
| 09/15/2011 | 1,067,260 | 57.71 | 2.33 M | 0.46 |
| 08/31/2011 | 1,009,783 | 49.80 | 3.67 M | 0.28 |
| 08/15/2011 | 1,251,376 | 35.36 | 5.68 M | 0.22 |
| 07/29/2011 | 1,204,119 | 21.16 | 3.81 M | 0.32 |
| 07/15/2011 | 721,415 | 21.01 | 3.38 M | 0.21 |
| 06/30/2011 | 1,289,823 | 17.72 | 2.46 M | 0.52 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2012 Bloomberg Finance L.P.
SN 273587 H192-590-1 12-Apr-12 12:57:41 EDT GMT-4:00

60.    Prior to the February 21, 2012 press release, the market value of TVIX rarely strayed from its indicative value by more than 3%. Subsequent to the press release, the market value closed at more than a 6% premium to the indicative value on the very next trading day, followed by a series of closing prices dramatically different from the indicative values, reaching a crescendo, one month later, of an 89.432% premium on March 21, 2012.

61.    The following chart, taken from *Bloomberg*, illustrates the market value of TVIX versus the indicative value for TVIX, showing that generally the two values moved in the same direction, albeit imperfectly, at least until right about the time when TVIX appeared on the "threshold list," discussed above, on March 20, 2012:



62.     Investors began to suffer from their lack of material information when during regular trading hours on March 22, 2012, rumors circulated in the market that Credit Suisse would again begin to issue the ETNs.  During the day, TVIX declined in price by over 29%, fueled by "naked short selling."  The occurrence of this suspiciously timed and heavy "shorting" would later result in several regulators commencing investigations, including the Massachusetts Attorney General.

63.     Notably, the S&P 500 VIX Short-Term Futures Index, which TVIX purportedly tracked, **was actually up** approximately 1.4% that day (March 22, 2012), increasing from 6633.56 to 6727.24.

19

64.   Not surprisingly, that evening, Credit Suisse announced that it would reopen

issuance of TVIX shares on a limited basis, with the following Press Release:

> Credit Suisse Plans to Reopen Issuance of VelocityShares Daily 2x
> Long VIX Short-Term ETN (Ticker Symbol: "TVIX") on a
> Limited Basis
>
> New York, March 22, 2012 Credit Suisse announced today that it
> plans to reopen issuance of the VelocityShares Daily 2x VIX
> Short-Term ETNs (Ticker Symbol: "TVIX") on a limited basis. The
> ETNs were temporarily suspended from further issuance by
> Credit Suisse on February 21, 2012 due to internal limits on the
> size of the ETNs. At present, the ETNs are trading at a premium to
> their indicative value.
>
> Beginning March 23, 2012, Credit Suisse may from time to time
> issue the ETNs into inventory of its affiliates to make the ETNs
> available for lending at or about rates that prevailed prior to the
> temporary suspension of issuances of the ETNs. Also, beginning as
> soon as March 28, 2012, Credit Suisse may issue additional ETNs
> from time to time to be sold solely to authorized market makers.
> Credit Suisse may condition its acceptance of a market maker's
> offer to purchase the ETNs on its agreeing to sell to Credit Suisse
> specified hedging instruments consistent with Credit Suisse's
> hedging strategy, including but not limited to swaps. Any such
> hedging instruments will be executed on the basis of the indicative
> value of the ETNs at that time, will not reflect any premium or
> discount in the trading price of the ETNs over their indicative
> value and will be on terms acceptable to Credit Suisse, including
> the counterparty meeting Credit Suisse's creditworthiness
> requirements, margin requirements, minimum size and duration
> requirements and such other terms as Credit Suisse deems
> appropriate in its sole discretion. This action does not affect the
> Early Redemption rights of noteholders as described in the pricing
> supplement. The other ETNs issued by Credit Suisse are not
> affected by this action.
>
> As disclosed in the pricing supplement relating to the ETNs under
> the heading "Risk Factors—The Market Price of Your ETNs May
> Be Influenced By Many Unpredictable Factors," the market value
> of the ETNs may be influenced by, among other things, the levels
> of supply and demand for the ETNs. It is possible that the
> reopening of the ETNs on a limited basis, as described above, may
> influence the market value of the ETNs. Credit Suisse cannot
> predict with certainty what impact, if any, the reopening described

above will have on the public trading price of the ETNs. It is possible that the resumption of new issuances of the ETNs, even on a limited basis, could reduce or remove any premium in the trading price of the ETNs over their indicative value. Investors are cautioned that paying a premium purchase price over the indicative value of the ETNs could lead to significant losses in the event the investor sells such ETNs at a time when the premium is no longer present in the market place or the ETNs are accelerated (including at our option), in which case investors will receive a cash payment in an amount equal to the closing indicative value on the accelerated valuation date.

65.     The March 22, 2012 press release failed to detail the criteria for Credit Suisse's "internal limits" and also fails to explain why it would issue additional ETNs at that time.

66.     The March 22, 2012 press release also alludes to another previously undisclosed risk, with the following statement:

> Also, beginning as soon as March 28, 2012, Credit Suisse may issue additional ETNs from time to time to be sold solely to authorized market makers. Credit Suisse may condition its acceptance of a market maker's offer to purchase the ETNs on its agreeing to sell to Credit Suisse specified hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps. Any such hedging instruments will be executed on the basis of the indicative value of the ETNs at that time, will not reflect any premium or discount in the trading price of the ETNs over their indicative value and will be on terms acceptable to Credit Suisse, including the counterparty meeting Credit Suisse's creditworthiness requirements, margin requirements, minimum size and duration requirements and such other terms as Credit Suisse deems appropriate in its sole discretion.

67.     This statement discloses that Credit Suisse's vertical and not open platform exposed TVIX ETNs to substantial risk and that the Pricing Supplement failed to disclose that said risks would be mitigated if market-makers were used and required to sell Credit Suisse offsetting hedging instruments as a condition to serve as a market maker.

68.     On March 23, 2012, shares of TVIX ETNs opened for trading and the security declined further by almost 30%, as reflected in the chart reproduced below, and the gap between market price and indicative value shrunk again by a dramatic 23%.



69.     Investors suffered significant economic damage because they purchased these securities absent adequate risk disclosures.  Indeed, *Bloomberg* reported that investors lost over $340 million when TVIX ENTs dropped more than 50 percent over the relevant period.

## COUNT I
## Violations of § 11 of the 1933 Act Against All Defendants

70.     This Claim is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §§ 77k, on behalf of the Class, against all Defendants.

71.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against all Defendants.

72.     Credit Suisse AG is the issuer of the TVIX ETNs sold pursuant to the Offering Documents, as defined above. The Individual Defendants are signatories or authorizers of the Registration Statement, which incorporates by reference the Pricing Supplement, as previously defined.

73.     Credit Suisse is absolutely liable for the material misstatements in and omissions from the Offering Documents. The other Defendants owed purchasers of the shares the duty to make a reasonable investigation of the statements contained in the Offering Documents to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. These Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Offering Documents as set forth herein.

74.     As signatories to, and/or authorizers of the Registration Statement, officers, directors of Credit Suisse or controlling persons of the issuers, Defendants owed the purchasers of its TVIX ETNs, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time that it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew or, in the exercise of reasonable care, should have known of the

material misstatements and omissions contained in the Offering Documents as defined herein. As such, Defendants are liable to Plaintiff and the Class.

75.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act. As a direct and proximate result of Defendants' wrongful conduct, the market prices for its TVIX ETN shares were materially different from the prices that Defendants misled the Plaintiff and the Class into believing they would be.  Plaintiff relied upon the false and misleading Offering Documents, causing Plaintiff and the Class to suffer substantial damages in connection with the purchase of the TVIX ETNs. Plaintiff and the Class all purchased TVIX ETN shares issued pursuant and/or traceable to the Offering Documents.

76.     At the time of their purchases of shares of the TVIX ETNs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered the material misstatements and omissions prior to the present date, or at least until March 23, 2012, since Defendants have exclusive possession and control over material facts and documents and the unforeseeable risks had not materialized. Less than one year has elapsed from the time that Plaintiff and other members of the Class discovered or reasonably could have discovered the facts upon which this Complaint is based. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff first filed the various complaints in this action.

77.     This action is timely filed under Section 13 of the Securities Act of 1933.

**COUNT II**
**Violation of §12(a)(2) of the 1933 Act Against all Defendants**

78.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act of 1933.

79.    The Offering Documents contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff and the other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Offering Documents as set forth above.

80.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Offering Documents at the time Plaintiff acquired the TVIX ETNs.

81.    By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act of 1933.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class sustained substantial damages in connection with their purchases of the TVIX ETNs.  Accordingly, Plaintiff and the other members of the Class who hold such securities have the right to rescind and recover the consideration paid for their securities, and

hereby tender their securities to the defendants sued herein.  Federal class members who have sold their TVIX ETNs seek damages to the extent permitted by law.

### COUNT III
### Violations of § 15 of the Securities Act Against the Individual Defendants

82.     Plaintiff incorporates by reference the above paragraphs, as if set forth herein. This Count is asserted against the Individual Defendants.

83.     Each of the Individual Defendants named herein acted as a controlling person of shares of TVIX ETNs within the meaning of Section 15 of the Securities Act. The Individual Defendants were each officers and/or directors and/or otherwise control persons of Credit Suisse charged within the legal responsibility of overseeing its operations. Each controlling person had the power to influence and exercised the same to cause his controlled person to engage in the unlawful acts and conduct complained of herein.

84.     By reason of such conduct, the Defendants named in this Count are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of shares of TVIX ETNs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a  result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding punitive damages to Plaintiff and members of the Class;

D.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.     For declaratory judgment that Defendants' Offering Documents were false and misleading;

F.     Awarding damages in the form of rescission; and

G.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff and the class hereby demand a trial by jury of all issues so triable.

Dated:  May 25, 2012

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

Gregory M. Nespole, Esq.    (GN:6820)
nespole@whafh.com
Matthew M. Guiney, Esq.    (MG:5858)
guiney@whafh.com
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600

***Counsel for Plaintiff***

27

## <u>PLAINTIFF'S CERTIFICATION</u>

David Schottenstein ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transactions in VelocityShares Daily 2x VIX Short Term Exchange Traded Notes linked to the S&P 500 VIX Short-Term Futures Index securities during the Class Period specified in the Complaint are as follows:

| <u>Date</u> | <u># of Shares Purchased</u> | <u># of Shares Sold</u> | <u>Price</u> |
|---|---|---|---|
| 02/06/12 | 2118 | 0 | 14.39 |
| 02/06/12 | 15317 | 0 | 14.40 |
| 02/09/12 | 7200 | 0 | 15.37 |
| 02/09/12 | 4680 | 0 | 15.39 |
| 02/09/12 | 1200 | 0 | 15.38 |
| 02/09/12 | 3700 | 0 | 15.36 |
| 03/05/12 | 550 | 0 | 16.51 |
| 03/05/12 | 13395 | 0 | 16.52 |
| 03/23/12 | 0 | 48160 | 7.595 |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed below:]

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of May, 2012

David Schottenstein