UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re TVIX Securities Litigation

---------------------------------------------------------x

THIS DOCUMENT RELATES TO:                    MASTER FILE NO.
ALL ACTIONS                                  No.  12 Civ. 4191 (LTS)

---------------------------------------------------------x

OPINION AND ORDER

APPEARANCES:

WOLF HALDENSTEIN ADLER               DAVIS POLK & WARDWELL LLP
FREEMAN & HERZ LLP
  By:  Gregory M. Nespole, Esq.         By:  James H.R. Windels, Esq.
       Mark C. Rifkin, Esq.                  Emmet P. Ong, Esq.
       Matthew M. Guiney, Esq.               Melissa C. King, Esq.
       E. Joshua Rosenkranz, Esq.
  270 Madison Ave                        450 Lexington Ave
  New York, NY 10016                     New York, NY 10017


*Lead Counsel for Consolidated*          *Counsel for Defendants Credit Suisse*
*Plaintiffs Elite Aviation LLC,*         *AG, Credit Suisse Securities (USA)*
*Endless H3, David Schottenstein,*       *LLC, Brady W. Dougan, Renato*
*William Bostedo, Grace Trading*         *Fassbind, D. Neil Radey, Walter B.*
*LLC, Ann Nicolosi, Mountain Vista*      *Kielholz, Hans-Ulrich Doerig, Peter*
*LLC, Ram Sinai, DRHP, Inc., Md.*        *Brabeck-Letmathe, Thomas W.*
*Mostofa Afzal Momen, Rick L.*          *Bechtler, Robert H. Benmosche, Noreen*
*Colyer, Yohanna Marini, Jorge*          *Doyle, Jean Lanier, Anton Van Rossum,*
*Bitar Naim, Elias Antonio Khouri*       *Aziz R. D. Syriani, David W. Syz, Ernst*
*Makl, William Mathers, Brian*           *Tanner, Richard E. Thornburgh and*
*Vandiver, Farid Rahimi and*             *Peter F. Weibel*
*Robert Kovaks*

Laura Taylor Swain, United States District Judge

This consolidated case is a putative class action brought on behalf of investors who purchased Velocity Shares Daily 2x VIX Short Term Exchange Traded Notes[1] ("TVIX ETNs") between November 30, 2010, the date on which the TVIX ETNs were first offered, and the date of the Complaint in this action (the "Class Plaintiffs"), with certain claims brought only on behalf of a subclass consisting of investors who purchased TVIX ETNs between February 22, 2012, and March 22, 2012, while there was a temporary suspension of the issuance of TVIX ETNs (the "Dislocation Subclass Plaintiffs" and, together with the Class Plaintiffs, "Plaintiffs"). Plaintiffs allege that they invested in the TVIX ETNs pursuant to a March 25, 2009, Registration Statement and Prospectus (the "Registration Statement") and a series of pricing supplements (one of which is attached as Exhibit 1 to Defendants' Declaration in support of their motion and is referred to herein as the "Pricing Supplement" and, together with the Registration Statement, the "Offering Documents"). The Dislocation Subclass Plaintiffs also allegedly relied on the press releases issued by Credit Suisse on February 21, 2012 and March 22, 2012, respectively (the "Press Releases"). (CCAC ¶ 2.) Plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 17k and 77o.

Defendants Credit Suisse, AG, Credit Suisse Securities (USA), LLC (collectively,

---

[1]     Unlike exchange-traded funds, which buy and own their underlying investments, an ETN is an "unsecured debt obligatio[n], which do[es] not actually buy or sell assets to replicate an underlying index," issued by an underwriting bank. (Consolidated Class Action Amended Complaint ("CCAC") ¶ 48.) ETNs have a maturity date and are backed only by the credit of the issuer. The issuer promises to pay the holder of the ETN an amount determined by reference to the performance of a specific index or other benchmark of the ETNs on a maturity date 10, 30, or sometimes 40 years from issuance. (Id.) ETNs trade on exchanges throughout the day at prices determined by the market, based on "indicative" values calculated by reference to the relevant indexes or other benchmarks. The issuers of ETNs are not required to own the exact baskets of futures to which the ETNs are linked and, instead, maintain a net risk position that they manage as part of a bigger volatility portfolio. (Id. ¶ 50.)

"Credit Suisse")[2] and the individual defendants (who are directors and officers of Credit Suisse) (together with Credit Suisse, the "Defendants")[3] move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all of the claims asserted in the Consolidated Class Action Complaint (the "CCAC").  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v.  Having considered carefully the parties' submissions and arguments, the Court grants Defendants' motion in its entirety.


BACKGROUND

The following facts are alleged in the CCAC or drawn from the Offering Documents and Press Releases.  TVIX ETNs are one of the six types of ETNs that Credit Suisse offers to investors who seek exposure to the volatility of equities in the S&P 500 Index.  (CCAC ¶ 51.)  The "VIX" is a trademarked ticker symbol for the Chicago Board Options Exchange ("CBOE") Market Volatility Index, which measures the implied 30-day volatility of S&P 500 Index options.  (Id. ¶¶ 51, 54-56.)  The VIX is quoted in percentage points and roughly corresponds to the expected movement of the S&P 500 Index over the upcoming 30-day period, which is then annualized, allowing investors the ability to invest in changes in forward volatility based on their views of the future direction of the market.  (Id. ¶¶ 54-56.)  The specific ETN at issue here, the TVIX ETN, uses a formula to track the performance of the S&P 500 VIX Short-Term Futures

---

[2]       Defendant Credit Suisse AG is the issuer and Defendant Credit Suisse Securities (USA) LLC is the underwriter of the TVIX ETNs.

[3]       The individual defendants are Brady W. Dougan, Renato Fassbind, D. Neil Radey, Walter B. Kielhoz, Hans-Ulrich Doerig, Peter Brabeck-Letmathe, Thomas W. Bechtler, Robert H. Benmosche, Noreen Doyle, Jean Lanier, Anton Van Rossum, Aziz R.D. Syriani, David W. Syz, Ernst Tanner, Richard E. Thornburgh and Peter F. Weibel.

Index (the "Index"), which, in turn, is based on the value of futures contracts on the VIX. TVIX ETNs are designed to offer a leveraged exposure to the VIX (specifically, two times the daily performance of the Index) (Id. ¶¶ 56-65.) Applying this formula results in an Indicative Value for the TVIX ETNs, which changes throughout the day based on changes in the value of the Index.

TVIX ETNs must be rebalanced every day in order to track the Index and to achieve their daily investment objectives. Plaintiffs allege that the mechanics of the daily rebalancing caused the TVIX ETNs to underperform their target returns when held for longer than a single trading session. (Id. ¶ 63.) Plaintiffs assert that the Offering Documents misled investors as to the propriety of holding TVIX ETNs for longer than a single trading session because, inter alia, the "Offering [D]ocuments did not disclose the mechanics of daily rebalancing or how daily rebalancing would constantly disadvantage the portfolio, leading to lower daily closing indicative values . . . and lower market prices for TVIX ETNs" over time. (Id.)[4] Plaintiffs also allege that in 2012, which was a volatile time in the financial markets, investors and speculators sought exposure to VIX-related products in order to hedge volatility risk and the volume of TVIX ETNs soared. (Id. ¶¶ 69-70.)

On February 21, 2012, Credit Suisse announced, through a press release that was filed with the SEC, that it had temporarily suspended further issuances of the TVIX ETNs because it had reached "internal limits." (Id. ¶ 72; ("Feb. 21 Press Release").) The Feb. 21 Press Release warned that "the market value of the ETNs may be influenced by, among other things, the levels of

---

[4] TVIX ETNs have a formula-based Indicative Value, but trade at market prices, which fluctuate as investors buy and sell TVIX ETNs in the secondary market. Normally, the market price is close to the Indicative Value because of arbitrage opportunities between the two values (i.e., if the market price is above the Indicative Value, investors can buy new TVIX ETNs at the Indicative Value and sell them in the market at a higher price and vice versa).

supply and demand for the ETNs" and warned investors "that the temporary suspension of further issuances may cause an imbalance of supply and demand in the secondary market for the ETNs, which may cause the ETNs to trade at a premium or discount in relation to their indicative value" and that "any purchase of the ETNs in the secondary market may be at a purchase price significantly different from their indicative value."  (Id.)  Following this suspension, TVIX ETNs began trading at prices that did not correspond to the Index that they were designed to track and, by March 21, 2012, TVIX ETNs were trading at a 90% premium to their Indicative Value.  (Id. ¶ 73.) At the close of trading on March 22, 2012, Credit Suisse announced, again through a press release filed with the SEC, that it would reopen the issuance of TVIX shares on a limited basis the next day.  The market price of TVIX ETNs dropped rapidly and significantly beginning that afternoon. (Id. ¶¶ 74-76.)

Plaintiffs allege that, throughout the Class Period, the Offering Documents misstated and omitted material facts and information concerning the substantial risk associated with purchasing TVIX ETNs and the magnitude of that risk, including: (1) statements and other indicators suggesting that a holding period longer than one trading session was appropriate; (2) a series of "Hypothetical Examples" (projecting performance over a 20 year period) that misleadingly implied that TVIX ETNs could or should be held for longer than a single trading session and could or would deliver targeted returns over such a longer period, and omitted material information about the substantial risks that would adversely affect holders of notes over longer trading periods; and (3) "omitted material information concerning the quantifiable risk that the daily rebalancing of TVIX ETNs would cause the notes to underperform their targeted returns by an average of 24 basis points each day or 48.6% per annum."  (Id. ¶¶ 6, 85, 91, 105-07.)

With respect to the Dislocation Subclass, Plaintiffs allege that the Offering

Documents, inter alia, (1) misstated that Credit Suisse would issue more TVIX ETNs in order to meet any growth in the demand for them (id. ¶ 7), (2) omitted material information concerning whether there was a limit on the number of TVIX ETNs that Credit Suisse could or would issue or that Credit Suisse could or would cease issuing the notes (id. ¶¶ 7, 138), (3) omitted material information concerning whether Credit Suisse maintained internal limits on the number of TVIX ETNs it could or would offer for sale, (4) omitted material information concerning the nature and magnitude of the substantial risk that TVIX ETNs would become illiquid during that period (id. ¶¶ 7, 147), (5) omitted material information concerning the likelihood and the reasons why TVIX ETNs could deviate from their intrinsic value, including the impact of a decision to cease issuing TVIX ETNs (id. ¶¶ 143-57), and (6) omitted material information disclosing that the "vertical platform" employed by Credit Suisse to sell and manage TVIX ETNs (i.e., the use of affiliated companies to perform various functions relating to ETN issuance and the hedging of risks relating to the TVIX ETNs) was inherently more risky than traditional "open" platforms involving non-affiliated entities and made it more difficult for Credit Suisse to hedge its exposure to the notes (id. ¶¶ 7, 140.)

DISCUSSION

When deciding a motion, pursuant to Rule 12(b)(6), to dismiss a complaint the Court accepts the allegations in the complaint as true and draws all reasonable inferences in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court should not dismiss a complaint if plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). It is

not enough for a plaintiff to plead facts that are "merely consistent with" a right to relief.  Id. at

557.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009).

   Plaintiffs assert claims under Section 11 of the Securities Act, which "prohibits

materially misleading statements or omissions in registration statements filed with the SEC."  In re

Morgan Stanley Info. Fund Secs. Litig., 592 F.3d 347, 358 (2d Cir. 2010); see 15 U.S.C. §77(k).

Plaintiffs also assert "control person" liability claims under section 15 of the Securities Act, based

on the alleged violations of Section 11.  Where, as here, the Section 11 claims sound in negligence

rather than in fraud, Plaintiffs' pleading must satisfy the basic requirements of Rule 8(a)(2) of the

Federal Rules of Civil Procedure, rather than the heightened standard set by Rule 9(b).

"Therefore, notice pleading supported by facially plausible factual allegations is all that is required

– nothing more, nothing less."  In re Morgan Stanley Info. Fund, 592 F.3d at 358.

   When evaluating a Rule 12(b)(6) motion to dismiss, the Court may consider

documents that are referenced in the complaint, documents that plaintiffs relied on in bringing suit

and that are either in the plaintiff's possession or the plaintiff knew of when bringing suit, and

matters of which judicial notice may be taken.  See Chambers v. Time Warner Inc., 282 F.3d 147,

153 (2d. Cir. 2002).  On a motion to dismiss, the court may take judicial notice of offering

documents filed with the Securities and Exchange Commission.  ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  The Court has therefore considered the Offering

Documents, as well as the Press Releases, in evaluating the sufficiency of the allegations in the

CCAC.

Alleged Misstatements[5] or Omissions by Defendants

   To state a viable Section 11 claim, the plaintiff must allege facts demonstrating plausibly that: "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant[s] participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 358-59 (quoting 15 U.S.C. § 77k(a)).

   To determine the materiality of a misstatement or omission, the Court must consider "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor."  In re Morgan Stanley Info. Fund, 592 F.3d at 360 (quoting Rombach v. Chang, 355 F.3d 164, 172, n. 7 (2d Cir. 2004)).  "In judging whether an alleged omission was material in light of the information already disclosed to investors, we consider whether there is a substantial likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having significantly altered the total mix of information already made available."  In re ProShares Trust Secs. Litig., 728 F.3d 96, 102 (2d Cir. 2013) (citations and internal punctuation omitted and emphasis in original).  "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important."  Id. (internal quotation marks and citation omitted).  "[P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight" because "Section 11 claim[s] cannot be based on a 'backward-looking assessment' of the registration statement."  Charter Twp. of Clinton Police &

---

    [5]  Although Plaintiffs assert in the CCAC that Defendants' actionable conduct involved both misstatements and omissions, their factual allegations focus principally on alleged omissions, as will the Court's analysis of their claims.

Fire Ret. Sys. v. KKR Fin. Holdings LLP, No. 08 Civ. 7062(PAC), 2010 WL 4642554, at * 11

(S.D.N.Y. Nov. 17, 2010) (citation omitted).

Class Plaintiffs' Claim that the Offering Documents Misled Plaintiffs as to the<br>Appropriate Holding Periods for the TVIX ETNs

The Class Plaintiffs allege that the Offering Documents "misleadingly implied that

TVIX ETNs could or should be held for longer than a single trading session" and "omitted material

information about . . . the substantial risks that would adversely affect holders of the notes over

longer holding periods . . ."  (CCAC ¶ 6.)  The Class Plaintiffs further allege that the Offering

Documents "omitted material information concerning the quantifiable risk that daily rebalancing of

TVIX ETNs would cause the notes to underperform their targeted returns by an average of 24

points each day or 48.6% per annum."  (Id.)  The Class Plaintiffs' first set of allegations – that the

Offering Documents did not clearly warn investors not to hold the TVIX ETNs for longer than a

single trading session and omitted information about the substantial risks that would adversely

affect note holders over longer holding periods – are rendered untenable by the more than 25 plain

English warnings concerning the risks of prolonged investments that are provided throughout the

Pricing Supplement.

The Pricing Supplement ("PS") states, inter alia, that: TVIX ETNs were designed to

achieve their investment objective on a daily basis (PS at cover page); that a TVIX ETN's

performance can "differ significantly" from its stated objective if held for longer than one day (id.

at cover page, 1, 8 and 9); that TVIX ETNs are not suitable for investors who intend to hold the

notes for longer than one day and investors should monitor their investments even intra-day (id. at

cover page);[6] that the relationship between the notes' Indicative Value and the Index will begin to break down over holding periods longer than one day (id. 27-28); that the long-term expected value of a TVIX ETN is zero (id. at cover page); and that the TVIX ETN financial product is intended to be used only by sophisticated investors to manage risk (id. 9).  These same warnings are repeated under the heading, "Long Holding Period Risk" (id. 8); under the heading, "Is this the right investment for you?" (id. 9-10); and in the thirteen-page "Risk Factors" section of the Pricing Supplement (id. 26-38).  The Offering Documents thus explicitly warned Class Members that the TVIX ETNs were complex, volatile financial products designed for sophisticated investors' use in daily hedging, and that significant losses would likely attend longer-term holding strategies. Similar disclosures were held sufficient to apprise a reasonably prudent investor that "the [financial products] could not meet their goal for any period longer than one day and might in fact produce very different results if held for a longer period" in In re ProShares, 889 F. Supp. 2d 644, 654 (S.D.N.Y. 2012), aff'd, 728 F.3d 96 (2d Cir. 2013).

Plaintiffs nonetheless contend that the Offering Documents should have spelled out and quantified particular risks associated with the mechanics of daily rebalancing, which "virtually ensured that the TVIX ETNs would underperform their expected returns each trading day."  (Pl. Opp. at 20.)  According to the Plaintiffs, the TVIX ETNs lost a small but unavoidable percentage of their returns each day, which made it impossible for them to achieve their expected returns over any period longer than a single trading session.  (CCAC ¶¶ 80, 85.)  Plaintiffs allege that, within two

---

[6]    When describing the type of investor who should invest in TVIX ETNs, the Pricing Supplement states that the TVIX ETNs were not designed for investors who "seek a long-term investment objective;" "seek current income from your investment;" "are not . . . sophisticated investor[s] and [who] seek an investment for other purposes than managing daily risk;" and "seek an investment with a longer duration than a daily basis."  (PS 9-10.)

years, the TVIX ETNs would have become virtually worthless due to the cumulative decay, and assert that the Offering Documents should have included a projection to that effect.  (Id. ¶¶ 80-87.) Plaintiffs also fault Defendants' failure to state that the mathematical formula used by the Defendants "to achieve the TVIX ETNs' daily investment targets clearly showed that the leveraged results would correlate with market volatility and the length of the holding period, not the direction in which the Index moved over time."  (Pl. Opp. at 21.)  According to the Plaintiffs, the statement in the Offering Documents that "[d]aily rebalancing will impair the performance of each ETN if the underlying Index experiences volatility" was insufficient to cover the virtual certainty and magnitude of the daily decay of the notes.  (CCAC ¶ 78.)

The Pricing Supplement, however, explained that TVIX ETNs rebalanced their theoretical exposure on a daily basis in order to provide a return which was related to the daily performance of their Index.  (PS 38.)  To clarify how rebalancing worked, the Pricing Supplement also included mathematical examples demonstrating for investors how rebalancing would magnify losses and erode gains.  (See, e.g. Id. 28-29.)  Moreover, the Pricing Supplement states that "[a]t higher ranges of volatility, there is a significant chance of a complete loss of the value of the ETNs even if the performance of the applicable underlying Index is flat" and that "[t]he ETNs are designed as short-term trading vehicles for investors managing their portfolios on a daily basis" and "are not intended to be used by, and are not appropriate for investors who intend to hold positions in an attempt to generate returns over longer periods of time."  (Id. 38)  The erosion of the TVIX ETNs' value over longer periods of time was emphasized throughout the Pricing Supplement.  (See, e.g., PS at cover page, PS 1, 8-9, 38.)  The fact that the TVIX ETNs' value was likely to erode was thus made obvious to a reasonable investor.

The Class Plaintiffs' contentions that Defendants knew at the time of their issuance

that TVIX ETNs would become worthless in two years and that this knowledge should have been disclosed to investors are similarly unavailing.  This argument appears to be based on a retrospective analysis of the historical data, as Plaintiffs assert in the Complaint that "given the level of volatility in the VIX at the time, loss would average approximately 24 basis points or (.24%) each and every day."  (CCAC ¶ 85.)  As the district court observed in In re ProShares, 899 F. Supp. 2d at 656, "[w]hatever formula was used [in developing the figures plaintiffs claimed should have been included in the earlier disclosure]. . ., it would necessarily rely on inputs from the underlying index or benchmark, and those inputs could not be known in advance.  It is not a material omission to fail to predict future market performance."  See also Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008) ("securities laws do not require clairvoyance in the preparation of offering documents").  Nor did Defendants have a duty to include forecasts "based on a range of historical VIX volatility."  (Pl. Opp. at 23, n. 21.)  Since historical volatility data or the volatility trends are publicly available, their disclosure is not required.  See, e.g., In re Merrill Lynch & Co., Research Reports Sec. Litig., 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) ("Sections 11 and 12(a)(2) do not require the disclosure of publicly available information").

The disclosure documents at issue in Rafton v. Rydex Series Funds, No. 10 Civ. 01171(LHK), 2011 WL 31114, at *5 (N.D.Cal. Jan. 5, 2011), on which Plaintiffs rely heavily for their argument that pointing to omissions of detailed information is sufficient to state plausibly their Section 11 claim, involved a different overall mix of information.  There, the disclosure documents were, inter alia, equivocal about the effects of market volatility and longer term holdings.  Here, the Pricing Supplement stated clearly that daily rebalancing would impair performance if there was any volatility.  In the context of an instrument tied to an index of volatility, this disclosure was

sufficient, without detailed computations, to disclose the fundamental risk associated with volatility and daily rebalancing.  Cf. In re ProShares, 728 F.3d at 102 ("In the words of the district court below, '[w]hen a registration statement warns of the exact risk that later materialized, a [s]ection 11 claim will not lie as a matter of law.'") (citation omitted)).

The Pricing Supplement underscored repeatedly that the TVIX ETNs were intended to be used "as short-term trading vehicles for investors managing their portfolios on a daily basis." (PS 38.)  Investors were further warned that "[t]he ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day" (id. at cover page) and that "[t]he relationship between the level of the VIX Index and the underlying futures on the VIX Index will begin to break down as the length of an investor's holding period increases, even within the course of a single Index Business Day" (id. 27).  Because the Offering Documents, read as a whole and in context, disclosed the fundamental risks associated with daily rebalancing and informed the reasonable investor that the TVIX ETNs were not suitable for longer-term investment strategies and unsophisticated investors, Plaintiffs' allegations that further details and computations should have been included are insufficient to state plausibly their Section 11 claim that material information necessary to make the disclosures not misleading was omitted.

Plaintiffs fare no better in their effort to establish a Section 11 violation by alleging that information that accompanied Defendants' warnings and risk disclosures so undermined that language as to mislead a reasonable investor.  Plaintiffs cite In re Direxion Shares ETF Trust, 279 F.R.D. 221 (S.D.N.Y. 2012), a decision in which plaintiffs were held to have stated a Section 11 claim for misrepresentations or omissions by focusing on language proximate to risk warnings that arguably undermined the import of the disclosure.  Such "contra-indicators," according to the

Direxion Shares Court, were sufficient to state a claim that the disclosures did not reveal sufficiently "the magnitude of the risk."  Id. at 232.  Here, Plaintiffs argue that, although there were references to the "daily" nature of proper TVIX ETN investments in the Offering Documents, the Offering Documents were also "replete with contra-indicators" which misled the Plaintiffs into believing that holding the TVIX ETNs for longer than one day was appropriate.

Plaintiffs point to three alleged contra-indicators in the Offering Documents: (1) references to a cash pay-out at maturity, which allegedly indicated that TVIX ETNs could properly be held until maturity; (2) four pages of "Hypothetical Examples" which allegedly misled investors as to how long it was appropriate to hold the TVIX ETNs; and (3) warnings in the Offering Documents that also allegedly implied that holding TVIX ETNs for longer than one day was appropriate.  (Pl. Opp. at 15.)

The Court's consideration of Plaintiffs' "contra-indicator" arguments begins with a return to first principles – the question at issue is whether the Offering Documents were rendered misleading by material omissions.  As explained above, "[i]n judging whether an alleged omission was material in light of the information already disclosed to investors, we consider whether there is a substantial likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having significantly altered the total mix of information already made available."  In re ProShares, 728 F.3d at 102 (citations and internal punctuation omitted).  To the extent that Plaintiffs' contra-indicator approach relies on reading individual words and phrases against each other in isolation, its consistency with these principles is questionable.  The Court has, however, reviewed both the juxtaposition of the particular elements identified by Plaintiffs and the overall mix of information provided and, as explained below, concludes that Plaintiffs have not pleaded plausibly that a reasonable investor could have read the Offering Documents without

understanding that the daily balancing and leveraging features of the TVIX ETNs exposed investors to the risk of significant losses if they held the securities for more than a day.

The first alleged contra-indicators that Plaintiffs cite are statements in the Offering Documents that describe holding the TVIX ETNs to maturity.  (CCAC ¶¶ 65, 105-06.)  For example, Plaintiffs allege that the Pricing Supplement states that "investors will receive a cash payment at maturity, upon early redemption or upon acceleration by us that will be linked to the performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor Fee."  (Id. ¶ 66.)  This statement simply identifies the three circumstances under which TVIX ETN holders receive cash payments from Credit Suisse and does not suggest that investors hold the TVIX ETNs to maturity.  Moreover, when read in the context of the numerous adverse long-term investment disclosures in the Pricing Supplement, the Class Plaintiffs could not have reasonably concluded that the TVIX ETNs could appropriately be held until maturity.  As Plaintiffs concede, the Pricing Supplement warned that TVIX does not "guarantee any return of principal at maturity." (CCAC ¶ 105(a); Pl. Opp. at 14, n. 10.)  The Pricing Supplement stated multiple times that "**[t]he ETNs do not pay interest nor guarantee any return of principal and you may lose all or a significant part of your investment in the ETNs**" (see, e.g., PS 26 (emphasis in original)) and that "**[i]n almost any potential scenario, the closing Indicative Value . . . of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity**" (id. at cover page (emphasis in original)).  Plaintiffs were further warned that "**[t]he long term expected value of your ETNs is zero**." (PS 28 (emphasis in original).)

Disclosures relating to "provisions with respect to maturity" are required to be included in Item 202(b)(1) of Regulation S-K for a registered debt security, like TVIX ETNs, see

17 C.F.R. § 229.202(b)(1) and, as they were presented here in a neutral manner, limited references

to pay-outs at maturity, in a document that repeatedly emphasized the daily investment strategy and

the risks of longer term holdings, would not have led a reasonable investor to believe that the TVIX

ETNs should be held until maturity.  See In re Nokia OYJ, 423 F. Supp. 2d 364, 393, 397 (S.D.N.Y.

2006) (investors must consider the "total mix" of information available) (internal quotation marks

and citation omitted); DeMaria v. Andersen, 318 F.3d 170, 182 (2d Cir. 2003) (Section 11 claims

must be dismissed if the court finds that the offering materials "taken together would not have

misled a reasonable investor").

   Plaintiffs also allege that the hypothetical examples included in the Pricing

Supplements served as contra-indicators and misled investors by purporting to "illustrat[e] the

effect that different factors may have on the Maturity Redemption Amount" of the TVIX ETNs and

to "illustrat[e] a few of the potential possible Closing Indicative Values for the ETNs" while

offering hypothetical examples of returns after 20 years.  (CCAC ¶¶ 88, 92.)  Plaintiffs emphasize

that three of the four hypothetical closing Indicative Values for the year 2030, included as examples

in the Pricing Supplement, were not zero, and that at least one scenario hypothesized a significant

positive rate or return.  (Id., Pl. Opp. at 15.)  However, the hypothetical examples were

accompanied by explicit statements that they were intended merely to illustrate the effect of various

factors on the value of the ETNs and should not be taken as a prediction of results because each

example was "a random possibility generated by a computer among an infinite number of possible

outcomes . . . [y]our return may be materially worse," and "[t]he actual performance of the Indices

. . . may bear little relation to the hypothetical return examples."  (PS 12-13.)  Moreover, the

paragraphs introducing the examples, which Plaintiffs contend led them to believe that the ETNs

could be held for longer periods of time, stated that "[t]he hypothetical examples highlight the

negative impact of higher annualized volatility" and that "in almost any potential scenario the Closing Indicative Value of your ETNs is likely to be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs from inception to maturity."  (Id.)  Accordingly, as in In re ProShares, the hypothetical examples do not "specifically contemplate[ ] an investment strategy of holding for longer than one day," see In re ProShares, 889 F. Supp. 2d at 654. Furthermore, "[i]n determining whether the statements contained in the [Offering Documents] are materially misleading, the [Offering Documents] must be read as a whole."  In re AMF Bowling Secs. Litig., No. 99 Civ. 3023(DC), 2001 WL 286758, at *4 (S.D.N.Y. Mar. 23, 2001) (citations omitted).  "'[T]he central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities].'"  Id.  (citations omitted).  In light of the extensive disclosures in the Offering Documents, a reasonable investor could not have concluded that holding TVIX ETNs for any period was appropriate or recommended.

Plaintiffs further contend that even the warnings in the Offering Documents implied that holding the TVIX ETNs for longer than one day was appropriate, because those warnings stated that the performance of the TVIX ETNs would depend, in part, on "the path of the daily returns during the holder's holding period."  (CCAC ¶ 78.)  The paragraph of the Pricing Supplement in which this phrase appears reads as follows:

> Daily rebalancing will impair the performance of each ETN if the underlying Index experiences volatility and such performance will be dependent on the path of daily returns during the holder's holding period.  At higher ranges of volatility, there is a significant chance of a complete loss of value of the ETNs even if the performance of the applicable underlying Index is flat.  The ETNS are designed as short-term trading vehicles for

investors managing their portfolios on a daily
basis.  They are not intended to be used by, and
are not appropriate for, investors who intend to
hold positions in an attempt to generate returns
over longer periods of time.

(PS 38.)  Offering materials must be read as a whole and the challenged statements must be put in

the context of any surrounding cautionary language.  <u>Schoenhaut v. Ams. Sensors Inc.</u>, 986 F.

Supp. 785, 793 (S.D.N.Y. 1997).  The above-cited paragraph explains how volatility in the markets

will impair the TVIX ETNs' performance for holding periods longer than one day.  The phrase

focused upon by the Plaintiffs, when read in context, does not undermine the other disclosures

regarding the daily nature of the TVIX ETNs as an investment vehicle.  Indeed, it appears

immediately after a short paragraph that includes the statements: "The ETNs do not attempt to, and

should not be expected to, provide returns which achieve the inverse or a 2X leveraged return of the

Index for periods other than a single day.  Each of the inverse ETNs and 2X Long ETNs rebalances

its theoretical exposure on a daily basis, increasing exposure in response to that day's gains or

reducing exposure in response to that day's losses."  (PS 38.)  Plaintiffs, accordingly, have not

pleaded plausibly that a reasonable investor would have been misled as to the appropriate holding

period by the reference to "the path of the daily returns . . . during the holder's holding period" in

the quoted paragraph of the Pricing Supplement.  (CCAC ¶ 78.)

Neither Plaintiffs' identified "contra-indicators" nor the text of the Offering

Documents read in context and as a whole could have lead a reasonable investor to conclude that

holding TVIX ETNs on a longer than daily basis was an appropriate investment strategy, much less

one that could conceivably be profitable.  Plaintiffs have thus failed to plead plausibly that the

disclosure provided was misleading, or that omissions of additional computations or other

particularized disclosures illustrating the risks were material.  The Section 11 claims asserted on

behalf of the Class Plaintiffs will therefore be dismissed.

Dislocation Subclass Claims

On February 21, 2012, Credit Suisse issued a press release announcing a temporary suspension of new issuances of TVIX and, on March 22, 2012, it announced the reopening of new issuances of TVIX.  (CCAC ¶¶ 110-29.)  In the period during which new issuances were suspended, the TVIX ETNs traded in the secondary market at a premium over their Indicative Value; their market price dropped significantly when Credit Suisse began re-issuing TVIX ETNs. The Dislocation Subclass Plaintiffs claim that Defendants misled them by stating in the Offering Documents that Credit Suisse would issue more TVIX ETNs in order to meet any growth in demand for them and omitted material information concerning: (1) the existence of any limit on the number of TVIX ETNs that Credit Suisse would issue, whether Credit Suisse could or would cease such issuances and the circumstances under which any cessation would occur; (2) whether Credit Suisse maintained internal limits on the number of TVIX ETNs that it would issue and the relationship of the number of outstanding notes to any such limits; (3) the nature and magnitude of illiquidity risks associated with a cessation of TVIX issuances; (4) the likely effect of the suspension on TVIX ETN investor short selling behavior and consequent relationship between TVIX ETN market prices and Credit Suisse's exercise of discretion to issue new ETNs; and (5) whether the internal securities issuance and hedging structure that Plaintiffs refer to as Credit Suisse's "vertical platform" was riskier than other multi-party structures and made it more likely that Credit Suisse would cease or suspend note issuances.  (CCAC ¶ 7.)

*Alleged Misstatement*

Plaintiffs allege that Defendants "misstated that Credit Suisse would issue more TVIX ETNs in order to meet any growth in the demand for the notes." (CCAC ¶ 7(a).) They cite no specific provision of the Offering Documents for this proposition. Their allegation is belied by the plain text of the Offering Documents, which made it clear that Credit Suisse <u>could</u> issue additional notes but made no undertaking that Credit Suisse would always issue additional notes in response to demand. On the first page of its "Summary" section, the Pricing Supplement states: "[w]e may, without providing you notice or obtaining your consent, create and issue ETNs of each series in addition to those offered by this pricing supplement having the same terms and conditions as the ETNs of such series." (<u>See</u>, <u>e.g.</u>, PS 1, 55.) The Pricing Supplement specifically warned investors that Credit Suisse was "under no obligations [sic] to issue additional ETNs to increase the supply," and that, "[i]n our sole discretion, we may decide to sell additional ETNs subsequent to the Trade Date. " (PS 33-44.)

*Alleged Omissions*

As demonstrated in the preceding paragraph, the Offering Documents clearly disclosed that Credit Suisse had discretion to issue further TVIX ETNs or refrain from doing so. The risk of that suspension was thus made plain, and no reasonable investor could have read the Offering Documents as a guarantee against suspension of issuances. Plaintiffs complain that Credit Suisse did not disclose details of the circumstances under which issuances might be suspended, or the likelihood of such suspension. While it is true that Credit Suisse made no such advance disclosure, Plaintiffs have failed to plead plausibly that Credit Suisse had a duty to make such disclosure or that such disclosure was material. The fundamental risk – that of a suspension or

cessation – was disclosed in connection with the offering of these securities as a daily investment vehicle.  That such issuance was discretionary and could be suspended was further underscored by the February 21 Press Release, which also disclosed internal limits as a possible and actual trigger for suspension.  Any Subclass member buying after that date thus had clear notice that sales could and would be suspended, as well as knowledge that Credit Suisse retained discretion to issue more ETNs at any time.  That Press Release also disclosed that the suspension could lead to divergence of market prices from Indicative Values.

As a matter of law, the reason why the new issuances were suspended was immaterial once the possibility of suspension and the risks flowing from suspension were fully disclosed to the Plaintiffs.  Defendants are not required to "predict the precise manner in which risks will manifest themselves."  In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993).  Plaintiffs thus fail plausibly to plead any actionable omission with respect to disclosure of the nature and circumstances of suspension and new issuances as risk factors.

The Dislocation Subclass Plaintiffs' allegations that the risks faced by investors if new issuances were suspended and material information concerning why the TVIX ETNs could deviate from their intrinsic value were not adequately disclosed are thus belied by the Offering Documents and the Press Releases.  Indeed, the Pricing Supplement warned that numerous factors "will influence the market value of your ETNs" and that "[y]ou may . . . sustain a significant loss if you sell your ETNs in the secondary market."  (PS 33.)  The disclosed factors which would affect market price, listed in the Pricing Supplement, included the "[s]upply and demand for ETNs in the secondary market . . . [which] will be affected by the total issuance of the ETNs;" the Pricing Supplement further cautioned investors that "we are under no obligations [sic] to issue additional ETNs to increase the supply. " (Id.)  The Pricing Supplement also warned that "any purchase of

ETNs in the secondary market may be at a purchase price significantly different from their

indicative value."  (Id.)  Numerous risks relating to the secondary market for TVIX ETNs which

might cause the market price to separate from the Indicative Value were also disclosed, including

that Defendants were not obligated to create or maintain a secondary market for TVIX ETNs (id. 6,

33, see also, PS 35 ("[n]o assurance can be given as to . . . the liquidity or trading market for the

offered ETNs).  The February 21 Press Release also stated that "the suspension . . . may influence

the market value of the ETNs . . . [and] Credit Suisse believes it is possible that the temporary

suspension of further issuances may cause an imbalance of supply and demand in the secondary

market for ETNs, which may cause the ETNs to trade at a premium or discount in relation to their

indicative value."  (Feb. 21, Press Release.)  Therefore, whether the TVIX ETN's market price rose

from a lack of new shares to support short selling and resulting illiquidity as opposed to an

imbalance in supply and demand, the Pricing Supplement and February 21 Press Release had

adequately disclosed to investors that a restriction in the supply of the TVIX ETNs would affect

secondary market prices.  Once Credit Suisse warned investors that the TVIX ETNs' price would

be affected by changes in supply and demand, and further explained in the press release that the

suspension of new issuances could result in a premium of market price over Indicative Value, it

was not obligated to make a predication as to the probability that this would occur.  See, e.g.,

Panther Partners Inc., 538 F. Supp. 2d at 664 ("the securities laws do not require clairvoyance in the

preparation of offering documents").

        Finally, the fundamental risks posed by Credit Suisse's so-called "vertical

platform" were adequately disclosed to investors.  The Pricing Supplement includes extensive

disclosures on the roles of the various Credit Suisse entities in issuing, underwriting and hedging

the TVIX ETNs and it explains in detail the risks to the TVIX ETN investors from Credit Suisse's

hedging activities and how those activities could affect both the Index and the Indicative Value of

the TVIX ETNs.  (See, e.g., PS 10, 28-29, 33-34, 38, 52-53, 56.)  The fact that the "vertical

platform" might have been a factor in Credit Suisse's decision to suspend new issuances is

immaterial as a matter of law.  Credit Suisse did not have an obligation to predict exactly why it

might decide to suspend the issuance of new TVIX ETNs.  See, e.g., Panther Partners Inc., 538 F.

Supp. 2d at 664.  Because the fundamental risks associated with suspension and resumption of ETN

issuances, and of hedging, supply and demand as integral factors in the relationship between

indicative value and market value, and the likelihood of divergence between indicative and market

values during the period of suspension were disclosed, Plaintiffs have failed plausibly to allege

material omissions with respect to the Disclocation Subclass.  Accordingly, the claims asserted on

behalf of the Subclass will be dismissed as well.

Because the Class Plaintiffs and Dislocation Subclass Plaintiffs have not plausibly

pleaded claims under Section 11 of the Securities Act, the Court does not address Defendants'

argument that Plaintiffs have not properly alleged loss causation.


Control Person Liability under Section 15

"Section 15 liability is derivative of liability under Sections 11 and 12."  In re

Lehman Bros. Sec. & ERISA Litig., 903 F. Supp. 2d 152, 183 (S.D.N.Y. 2012).  The viability of

Plaintiffs' Section 15 claim is thus dependent on the pleading of their underlying Section 11 claims.

 Because they have failed plausibly to plead Section 11 claims, their complaint will be dismissed in

its entirety.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss the CCAC is granted in its entirety.  This Memorandum Order resolves docket entry number 33.  As this case is dismissed, the pending motion to intervene (docket entry no. 46) is hereby terminated.

The Clerk's Office is respectfully requested to enter judgment dismissing Plaintiffs' Consolidated Class Action Complaint and to close this case and cases 12 civ. 4756 and 12 Civ. 5475.

SO ORDERED.

Dated: New York, New York
      June 9, 2014


    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge